BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



'08 CIVIL 63PY

JUDGE SULLIVAN

08 Cv.

| | |
|---|---|
| MIRANOS INTERNATIONAL TRADING INC., | |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | 08 CV 4763 |
| ECOTRADE INTERNATIONAL S.A., | |
| Defendant. | |

Plaintiff MIRANOS INTERNATIONAL TRADING INC. ("Plaintiff"), as Owner

of the M/V UNIVERSAL CHALLENGER, by its attorneys Blank Rome LLP,

complaining of the above-named Defendant ECOTRADE INTERNATIONAL S.A.

("Defendant"), alleges upon information and belief as follows:

1.      This is a case of admiralty and maritime jurisdiction, as hereinafter more

fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction.

2.      At all material times, Plaintiff was and now is a foreign company organized

and existing under the laws of Panama and the owner of the Motor Vessel UNIVERSAL

CHALLENGER (the "Vessel").

3.      On information and belief, at all material times, Defendant was and now is a corporation organized and existing under the laws of Luxembourg with an office and place of business at Rue du Marché Aux Herbes 4, 1728 Luxembourg.

## THE BASIC FACTS

4.      Plaintiff chartered its Vessel to Defendant under a charter dated October 18, 2005 (the "Charter").

5.      Disputes arose under the Charter arising from Defendant's alleged breach which Plaintiff submitted to London arbitration by way of claims submissions dated July 7, 2006. Aff. Ex. 1 (the "Claim Submissions").

6.      The claims have been fully briefed in the London arbitration.

7.      This action is expressly filed without prejudice to that right of arbitration.

## COUNT I

## RULE B RELIEF

8.      Plaintiff repeats paragraphs 1 through 7 as if fully set forth herein.

9.      Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by Defendant or anyone acting on its behalf to date.

10.     At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | On the principal claims | $257,147 |
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $ 80,000 |
| C. | Interest over the course of 3 years at prime rate average of 8% per annum: | $ 61,715 |
| | **TOTAL:** | $398,862 |

11.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Defendant up to the amount of $398,862 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

D.    That Plaintiff may have such other, further and different relief as may be

just and proper.

Dated: New York, NY
       May 21, 2008

                                        Respectfully submitted,
                                        BLANK ROME LLP
                                        Attorneys for Plaintiff

                                        By _____
                                        Jeremy J.O. Harwood (JH 9012)
                                        405 Lexington Avenue
                                        New York, NY 10174
                                        Tel.: (212) 885-5000

## VERIFICATION

STATE OF NEW YORK       )
                        : ss.:
COUNTY OF NEW YORK      )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Blank Rome LLP, attorneys for Plaintiff.

2.    I have read the foregoing Complaint and I believe the contents thereof are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

_____
Jeremy J.O. Harwood

Sworn to before me this
21st day of May 2008

_____
Notary Public



900200.00001/6640281v.1                     5

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY  10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MIRANOS INTERNATIONAL TRADING INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>ECOTRADE INTERNATIONAL S.A.,<br><br>                    Defendant. | 08 Civ.<br><br>**AFFIDAVIT UNDER**<br>**SUPPLEMENTAL RULE B** |

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

1.      I am a member of the Bar of this Honorable Court and a member of the

firm of Blank Rome LLP, attorneys for the Plaintiff herein.  I am familiar with the

circumstances of the complaint and submit this affidavit in support of Plaintiff's request

for the issuance of process of maritime attachment and garnishment of the property of

defendant ECOTRADE INTERNATIONAL S.A., a company org anized and existing

under the laws of Luxembourg, pursuant to Rule B of the Supplemental Rules for Certain

Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

900200.00001/6640297v.1

2.      The defendant is not incorporated or registered to do business in this State.

3.      Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2008 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.      In our search, we did not find any listing or reference to defendant in this district or state.

5.      In the circumstances, I believe the defendants cannot be "found" within this district.

6.      I attach as Exhibit 1 hereto a copy of the claims submissions in London arbitration.

_Jeremy J.O. Harwood_
Jeremy J.O. Harwood

Sworn to before me this
21st day of May, 2008

_____
Notary Public

NEAL MITCHELL
Notary Public, State of New York
No. 01MI6114408
Qualified in New York County
Commission Expires Aug. 16, 20 08

# EXHIBIT 1

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

B E T W E E N :

MIRANOS INTERNATIONAL TRADING INC.

Claimants
("owners")

and

ECOTRADE INTERNATIONAL S.A.

Respondents
("charterers")

**"UNIVERSAL CHALLENGER" - C/P dated 18 October 2005**

---

CLAIM SUBMISSIONS

---

1.    By a charterparty dated 18 October 2005 on an amended Gencon form ("the charterparty") the Claimants ("the owners") agreed to let, and the Respondents as charterers ("the charterers") agreed to hire, the "UNIVERSAL CHALLENGER" ("the vessel") for a voyage from one safe berth Taranto (Ilva berth), Italy, to one safe berth East Coast Terminal Savannah, Georgia, USA.

2.    The charterparty, to which the owners will refer for its full terms and effect, provided expressly *inter alia* as follows:

        ""[Box] 12.    *Cargo ... (Cl. 1)*

                       *45,000 METRIC TONS 5 percent more or less in Owners' option of bulk granulated blast furnace slag (gbfs) harmless / non dangerous no IMO cargo.*

        ...

        [Box] 18.    *Demurrage rate (loading and discharging) (Cl.7)*

                       *US$20,000.- per day or prorate SEE CLAUSE 36*

        ...

[Box] 20.      Brokerage commission and to whom payable (Cl.14)

2.50 percent address commission to Charterers plus 1.25 percent to Bancosta (Monaco) S.A.M. on freight/deadfreight and demurrage

...

2.      Owners' Responsibility Clause

Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss damage or delay has been caused by the improper or negligent stowage of the goods or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the owners on board or ashore for whose acts they would, but for this clause be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. ...

...

5.      Loading Discharging Costs

The cargo shall be brought into the holds, loaded, stowed and or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.

The Owners shall provide winches, motive power if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and or cranes, if any. ...

...

7.      Demurrage

demurrage at the rate started [sic] in Box 18 per day or pro rata for any part of a day to be allowed at ports of loading and discharging.

...

14.      Brokerage

A brokerage commission at the rate stated in Box 20 on the freight deadfreight and demurrage earned is due to the party mentioned in Box 20. ...

102

...

*Clause n. 20*

...

*Balance freight plus demurrage or less dispatch, if any, as the case maybe, to be settled within 15 days after completion of discharge and receipt/agreement of Owners' final accounts with Statement of facts, Notice of Readiness, Time Sheets both ends.*

...

*Clause n. 21*

...

*Vessel to selfdischarge as fast as vessel can*

*Owners guarantee that vessel's cranes and grabs are in good-efficient order.*

*Receivers/Charterers guarantee a daily takeaway of 5,000 metric tons per weather working day of 24 consecutive hours Sundays and Holidays included, Bimco/local/superholidays excepted, if any).*

*Cargo to be discharged into hoppers ashore ashore [sic] loading trucks for take away.*

*Vessel to selfdischarge using own cranes and grabs operated by vessel's crew or in Owners' option foreign labours free of expenses to the Charterers provided same is permitted by local authorities and labour regulations, failing which Charterers to provide and pay for experienced shore labour to operate at their risk and expenses.*

*Experienced crane drivers/grab men to be supplied by the Receivers/Charterers free of expenses to the vessel.*

*Master option to give Notice of Readiness by phone, fax/telex whether in port or not, whether in berth or not, whether cleared at custom house or not, whether in free pratique or not during office hours and time to count 12 (twelve) hours unless sooner commenced after Notice of Readiness tendered accepted or not, whether in port or not, whether in berth or not, whether cleared at custom house or not, whether in free pratique [sic]*

*Shore labours and bulldozers including drivers for untrimming the cargo, to be employed and paid for by Charterers, and to be supplied upon master's request.*

*If at discharging the grabable condition of the cargo is reduced (e.g. because it has hardened) Charterers to provide suitable equipment (e.g. payloaders) to make the cargo sufficiently grabable.*

3

*Time lost by slower capacity of [sic] breakdown of vessel's cranes or grabs shall not count as laytime, unless vessel can maintain Charterers guaranteed minimum takeaway rate, in which case time to count.*

*Stoppages from shore including cranemen and/or reduced receiving capacity ashore to be compensated at the demurrage rate, but only to extent discharge operation not completed within allowed laytime. Charterers to provide and pay for sufficient shore labour and equipment required.*

...

*Clause n. 29 - Vessel's description*

...

| | |
|---|---|
| *NUMBER HOLDS/HATCHES* | *7 / 7* |
| *HOLD SIZE* | *AS PER BELOW* |
| *HATCH SIZE* | *ALL 14.4M X 15M* |
| *GEARED:* | *3X35TS, 3X25TS + 4X10CBM GRABS* |

...

*Clause n. 32*

*All terms and conditions of this Charter Party to include New Jason Clause, Both-to-blame Collision clause. U.S. Paramount clause, Canadian Paramount clause, Voywar 1950, Chamber of Shipping U.K. Paramount clause and P&I Nuclear clause which are deemed to form part of this Charter Party and to be incorporated in all Bills of Lading.*

...

*Clause n. 36*

*Demurrage USD 23.000.- [in fact agreed as US$20,000] per day or pro rata for any part of a day*

*Despatch half of demurrage rate on working time saved at loading port. Free dispatch at discharging port.*

...

*Clause 39.*

*First opening/closing of hatches not to count as laytime."*

3.    In light of clause 21 it was an express or implied term of the charterparty that the cargo would be in grabable condition.

4.    A copy of the charterparty is attached at **tab 1** of the bundle accompanying these submissions.

4

Demurrage

5.  The vessel loaded a cargo of 44,700mt of bulk granulated blast furnace slag bound for discharge in Savannah into hold nos. 1, 3, 4, 5 and 7 at Taranto between 26th and 29th October 2005.

6.  The vessel arrived at Taranto and tendered Notice of Readiness at 06.50hrs on 26th October 2005. Loading was completed at 08.55hrs on 29th October 2005.

7.  In all loading took 2 days 14 hours and 5 minutes. The total allowed laytime was 2 days 8 hours and 28 minutes. In the circumstances the vessel was on demurrage for 5 hours and 37 minutes, and demurrage accrued in the sum of US$4,505.03 net of brokerage commission, or US$4,680.56 gross. A copy of the owners' laytime and demurrage calculation is attached at **tab 2** of the bundle accompanying these submissions.

8.  The vessel arrived at Savannah and tendered Notice of Readiness at 07.00hrs on 17th November 2005. Discharging was completed at 12.00hrs on 4th December 2005.

9.  In all discharging took 15 days 5 hours and 55 minutes. The total allowed laytime was 8 days 22 hours and 34 minutes. In the circumstances the vessel was on demurrage for 6 days 7 hours and 21 minutes, and demurrage accrued in the sum of US$121,395.31 net of brokerage commission, or US$126,125.00 gross. A copy of the owners' laytime and demurrage calculation is attached at **tab 3**.

10. Wrongfully and in breach of the charterparty the charterers have refused and/or failed to make payment in full of demurrage due under the charterparty. A copy of the owners' invoice dated 7th December 2005 in the total sum of US$165,159.51 is attached at **tab 4**. Of this sum charterers have remitted US$43,764.20, leaving a balance of US$121,395.31 outstanding.

Loading/the cargo

11. The cargo was stock piled in the open at Taranto and was loaded on board the vessel using shore based loading conveyors. Puddles of water on the jetty on the vessel's arrival at Taranto indicated rain prior to the vessel's arrival. The air temperature at Taranto during loading ranged between around 15 and 26°C. There was no rain or bad weather during loading or on the sea passage to Savannah, and nor were there any extreme temperatures. The air temperature on the voyage remained broadly consistent with that on loading at Taranto.

12. During the course of loading the cargo the ship's personnel noticed variations in the colour of the cargo, from white to almost grey. It was evident that there was moisture in

105

the cargo.  This was not free-flowing and there was some adherence between the granules/particles.

13.    Prior to the disclosure stage the best particulars of the condition of the cargo and of the cause of the solidification of the cargo that subsequently occurred that the owners are able to give is that the cargo was loaded with excess moisture content and/or at excessive high temperature making it liable to solidify, and/or with a chemical make-up making it liable to solidify.  The owners will maintain that nothing done by them or on their behalf at any time during the course of the voyage impacted on the condition of the cargo.    Furthermore there were no relevant climatic or other changes affecting the cargo.  Accordingly the cause of the solidification of the cargo was inherent vice, for which the owners can have no responsibility.

The vessel's cranes and grabs

14.    The vessel was originally constructed with 4 cranes, but two further cranes were subsequently retro-fitted by the owners to augment the vessel's discharge speed capacity.  However the vessel only carries 4 grabs for 6 cranes, and was accordingly fixed to the charterers as having 4 cranes/4 grabs - see the attached e-mail correspondence between the owners' brokers, ED&F Man Shipping, and the charterers/their brokers appearing at **tab 5** of the bundle accompanying these submissions.  These exchanges also made clear the parties' agreement that none of the vessel's crew would act as cranemen, and that the charterers were required to provide and pay for competent crane drivers.

15.    On 17th October 2005, prior to the conclusion of the charterparty, the vessel's cranes nos. 2, 3, 4, 5 & 6 passed an annual gear survey carried out by Lloyd's Register at the vessel's previous discharge port of Tartous in Syria.

16.    Crane no.1 was repaired at the anchorage at Algeciras en route to Savannah, but Lloyd's Register were not able to deal with the outstanding annual gear survey for this crane without the vessel being at the berth.  Rather than delay the vessel, the owners arranged for the survey to be carried out by Lloyd's Register at Savannah prior to the commencement of discharging.  This was completed at 15.20hrs on 17th Nov September 2005 without causing any delay to the vessel.  The "Certificate of Test and Thorough Examination of Lifting Appliances" issued by Lloyd's Register at Savannah that day records that "no defects or permanent deformation were found; and that the safe working load is as shown [25mt]".

17.    Prior to the vessel's departure from Tartous crane no.2 suffered a breakdown, which following the attendance of technicians at Algeciras was traced to the hoist and gearing at the top of the crane tower.  Crane no.2 was not in working order during discharge at Savannah, and certain parts were removed and landed at Savannah to enable repairs to

105

be undertaken. Crane no.2 was one of the two additional cranes retro-fitted to the vessel, and was not required for discharge at Savannah.

18.     There were accordingly 5 cranes (each serving one of the 5 laden holds) and 4 grabs in good order and condition at the commencement of discharging at Savannah.

Discharging

19     By the time of discharge at Savannah the cargo had formed large solidified clumps, particularly at the sides of the vessel where the cargo had become adhered to the ship's frames, and was not readily capable of being lifted from the vessel's holds by the ordinary use of grabs.

20.     During the course of discharging there were a number of equipment failures, including of the vessel's grabs and other associated equipment, but also of a variety of equipment obtained by or on behalf of the charterers from their appointed stevedores/others ashore. The owners maintain these failures arose as a result of the solidified state of the cargo, and the improper operation of the grabs and cranes by the charterers/their stevedores - effectively using them to try to break up solidified clumps of cargo in order to enable the cargo to be lifted out of the holds. The effect was to apply excess load to the grabs, causing damage to and electrical and mechanical failure of the grabs and associated equipment, including motors, hydraulics, electrical lines and generators.

21.     The owners sought to obtain replacement equipment and spare parts, including by engaging a local manufacturer to fabricate replacement parts for the vessel's grabs, and by arranging for spare parts to be airfreighted from Germany. It was only by so doing, and by "cannibalizing" sound parts from the vessel's damaged grabs, that one of the vessel's grabs was kept operational until the conclusion of discharging.

22.     The owners also requested suitable replacement grabs, additional bulldozers and other equipment from the charterers/their stevedores, but either there were delays in the provision of this equipment or it was not provided. Even such replacement/additional equipment as was made available in many instances sustained damage by reason of the same improper operation by the charterers/their stevedores.

23.     The various failures are apparent from exchanges with the ship's agents appearing at **tab 6**, the statement of facts for Savannah appearing at **tab 7**, and the vessel's logs appearing at **tab 8** of the bundle accompanying these submissions. The owners will provide further details of the failures in their witness evidence in due course.

24.     The charterers also failed to provide sufficient experienced crane drivers/grab men, and to employ sufficient shore labours including drivers for untrimming the cargo.

Breach of charterparty

25.   In the circumstances the charterers were in breach of clause 21/the express or implied term of the charterparty referred to at paragraph 3 above, in that the cargo (or a significant part of it) was not in grabable condition (because it had hardened/solidified) and/or by reason of their failure to meet the guaranteed daily takeaway of 5,000 metric tons per weather working day of 24 consecutive hours Sundays and Holidays included, Bimco/local/superholidays excepted, if any and/or in failing to provide sufficient experienced crane drivers/grab men and/or in failing to employ sufficient shore labours including drivers for untrimming the cargo and/or in failing to provide (and to use only) suitable equipment (eg. payloaders) to make the cargo sufficiently grabable.

26.   Further or alternatively the cargo was dangerous cargo, in the sense that it was liable to and did solidify causing damage to the vessel, to other property, and to the cargo itself, and serious delay to the progress of the overall voyage/the period spent discharging.

27.   In the circumstances the charterers were in breach of an express obligation set out at box 12 of the charterparty that the cargo would be harmless/non dangerous and/or an implied obligation not to ship dangerous cargo.  In the absence of notice of the actual condition of the cargo, which if provided would have entitled owners to refuse the cargo, and given that such actual condition was not and could not reasonably have been apparent to the owners, the charterers can be taken to have warranted the cargo was fit for carriage in the ordinary way and was not dangerous.  In the circumstances the owners maintain the charterers are strictly liable for all consequences of the condition of the cargo.

28.   By reason of these breaches the owners are not limited to claiming demurrage/damages for delay at the demurrage rate, but are free to claim damages at large.  The charterers are accordingly liable to indemnify the owners for any and all consequences of the hardening/solidification of the cargo.

29.   Further or alternatively the charterers are liable for all damages and expenses directly or indirectly arising out of or resulting from the shipment of the cargo pursuant to Article IV rule 6 of the Hagues Rules, incorporated into the charterparty the clause paramount referred to at clause 32.

The owners' claims

30.   The owners paid the costs of shore grab rental made necessary by the improper operation of the vessel's grabs. These costs totalled US$33,385.88, as evidenced by the invoice of East Coast Terminal Company dated 12th June 2005 appearing at **tab 9**.

31.   The costs of the repair of the vessel's grabs totalled US$9,800.

32.  By reason of the delay to the vessel caused by the solidified state of the cargo the owners sustained substantial additional dockage charges. Pursuant to clause 21 of the chaterparty the charterers guaranteed a daily takeaway of 5,000mt per weather working day of 24 consecutive hours Sundays and Holidays included, which for the cargo of 44,700mt should have meant that discharging completed in around 7 days. In the event it took almost 18 days. The additional dockage charges incurred by reason of this delay totalled US$92,566 (18-7=11 days x US$0.235 X 35,809 GRT), as evidenced by the invoice of Capes Shipping Agencies dated 30th November 2005 appearing at **tab 10**.

33.  The owners claim interest pursuant to section 49 of the Arbitration Act 1996 on such amounts as are found due to them, for such period and at such rate as the Tribunal shall think fit.

AND THE CLAIMANTS CLAIM

  (1)   US$121,395.31 in respect of demurrage;
  (2)   US$33,385.88 in respect of the costs of shore grab rental;
  (3)   US$9,800 in respect of the costs of the repair of the vessel's grabs;
  (4)   US$92,566 in respect of dockage charges;
  (5)   alternatively damages;
  (6)   compound interest pursuant to the Arbitration Act 1996;
  (7)   costs.

SERVED this 7th day of July 2006 by Holman Fenwick & Willan of Marlow House, Lloyd's Avenue, London EC3N 3AL, Solicitors for the Claimants.